GERMAN INS. CO. OF FREEPORT, ILL., v. DOWNMAN et al.

(Circuit Court of Appeals, Fifth Circuit. April 22, 1902.)

No. 1,093.

1. EQUITY—RETENTION OF JURISDICTION ACQUIRED—DETERMINATION OF ENTIRE CONTROVERSY.

A court of equity in which cross suits have been brought, one for the reformation of an insurance policy and to enforce payment of a loss thereunder, another for a cancellation of such policy, and a third to enjoin the further prosecution of an action at law thereon pending in

115 F.—31

the same court, on the consolidation and trial of such suits together, including all questions at issue between the parties, has jurisdiction to determine all such issues, and to render judgment against the insurer on the policy for the loss.[1]

**2. INSURANCE—CONTRACT—EXECUTORY AGREEMENT TO INSURE.**

The manager of a large lumber plant, previously uninsured, agreed on behalf of his principal to place insurance on certain of the properties, aggregating $70,000, with a firm of insurance agents representing a number of companies. The amount to be written on each of the designated properties was fixed, the premiums agreed to, and that the policies should be written to go into effect on the 1st day of the ensuing month, but the companies were not agreed upon, nor the amounts or specific properties which should be insured by any particular company. The manager requested that not more than $5,000 be placed in any one company, but the matter was left to the discretion of the agents; the policies when written, however, to be subject to approval by the manager or owner of the property. *Held*, that such agreement did not constitute a contract of insurance binding any of the companies in which policies were afterwards written, which became bound only when their policies had been delivered and accepted, and in accordance with their terms.

**3. SAME—ACCEPTANCE OF POLICY.**

The policies, 18 in number, were written, and included one for $15,000, covering a drying shed and contents, in defendant company, which at the time of the agreement the agents did not represent, but the agency for which they had in the meantime acquired. All were by their terms to take effect at 12 o'clock noon on the day designated. During the forenoon of that day, and before the policies had been delivered or accepted or the premium paid thereon, the drying house burned. The owner subsequently secured possession of the policies from the agents, as they claimed, by representing that none of the property covered by such policies had been injured by the fire, but refused to accept any of them except the one covering the drying house, on the ground that they were for too large amounts, although that was the largest, and only one other was for an amount exceeding $5,000. *Held*, that the acceptance of defendant's policy under such circumstances did not create a contract of insurance covering the loss, even conceding the claim of plaintiff that under the previous agreement by the agents the insurance should date from the first moment of the day specified.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

During the month of April, 1898, William Cameron, the testator of the appellees, owned a large lumber manufacturing plant at Bowie, La., consisting in part of a sawmill and machinery; two patent dry kilns; two large dry-shed buildings, with elevated covered cooling platforms, with car tracks thereon connecting the dry kilns with the dry sheds; a large planer building and machinery, adjoining one of the sheds; a store building and contents; with a large stock of upper grades of lumber, such as finish, stored in the dry sheds, and a very large stock of common grades of lumber, which go to the yard without passing through the dry kilns,—the plant and accumulated stock amounting in value on April 12 and 16, 1898, to an aggregate of about $500,000, and on which during the whole of the month of April, 1898, the owner had no insurance. It does not appear whether any part of this large property had ever been insured, or whether the owner up to that time had carried the risk thereon himself. One T. Gordon Reddy, Jr., was then the general manager for the owner of all this property. At that time, and for some years previously, J. J. Craig was and had been engaged in business as a local insurance agent at New Iberia,

---

[1] See Equity, vol. 19, Cent. Dig. § 104.

La., and was then associated with Craig, Cage & Suberbielle as partner in the business of such agency. Beginning in February, 1898, and continuing from time to time until the 12th of April, Craig visited Bowie to solicit for insurance of Cameron, or his general manager, Reddy, and to inspect the properties and their respective risks. On April 12, 1898, Reddy agreed to place with Craig an order for insurance amounting in the aggregate to $70,000 on certain designated properties, of which amount $15,000 was to cover the long dry shed and its contents, involved in this litigation. The amount to be written on each of the designated properties was fixed, the rate of premium on each was agreed to, and that the insurance should be written to begin on May 1, 1898. At this time Craig represented 15 or more different insurance companies, but did not have authority to represent the appellant. Of this Reddy was informed. He was also informed that Craig expected soon to receive authority to represent several other companies, including the appellant. On April 26th Craig did receive authority to represent the appellant as its local agent in a district including Bowie, and on that day his firm sent a wire message to Manager Reddy, addressed to him at Bowie, which, having been forwarded to him at New Orleans, he answered by the letter of date April 27th, embodied in the opinion. Reddy requested Craig not to place more than $5,000 in any one company, on which Craig assured him that if he would leave the matter to them (the agents) they would fully protect Mr. Cameron's interests. Policies to the number of 18, distributed according to the disposition made by Craig among his constituent companies, were written up and duly authenticated by 10 o'clock a. m., May 1, 1898, each bearing date on that day, and stipulating that it "does insure William Cameron for the term of one year from the first day of May, 1898, at noon, to the first day of May, 1899, at noon, against all direct loss or damage by fire," etc. These policies, with the letter of advice stated in the body of the opinion, were put in a package, and about 10 o'clock a. m., May 1, 1898, were placed by Craig with the agent of the express company at New Iberia, to be shipped to William Cameron at Bowie. Before it was shipped, and about 1 o'clock the same day, Craig reclaimed the package, and retained possession of it until a little after midnight on the morning of May 2d, when it was surrendered to the agents of Cameron under circumstances fully stated in the opinion. A little after 11 o'clock a. m., May 1, 1898, it was discovered that one of the dry kilns in the lumber yard of William Cameron at Bowie was on fire, and by this fire the dry shed and contents, described in the appellant's policy, were destroyed.

On May 17, 1898, the appellant brought its suit against William Cameron in the circuit court for the Northern district of Texas, alleging the issuance of the policy; "that by its terms it provided for insurance against all direct loss or damage by fire to the following described property [describing it] that might happen to the same from noon of the 1st day of May, 1898, to twelve o'clock noon on the 1st day of May, 1899"; that the premium had not been paid; that the company had received no consideration for the issuance of the policy; that prior to the time when it was to take effect the property to be insured was destroyed by fire; that the policy is in the possession of the defendant, who refuses to deliver it to the plaintiff, but seeks to vex and harass the plaintiff by withholding it and claiming rights thereunder; that the testimony by which it can establish the fact that the property was destroyed by fire before its policy took effect is oral; that the witnesses reside in different localities; that some of them are of migratory habits and of uncertain habitations, and that if delay occurs in the hearing of this cause the testimony of these witnesses will become wholly inaccessible to plaintiff and irreparable injury will ensue to it,—concluding with the prayer that upon final hearing the policy of insurance be canceled, and for general relief. This suit was entered on the law docket at Dallas, and numbered 2,133. Cameron moved to transfer the proceeding to the Waco division of the court, and, not waiving that motion, answered the petition by general demurrer and general denial.

Some time in August, 1898, William Cameron instituted in the state court a suit against the appellant on the policy. This suit was duly re-

moved into the circuit court, where an order was made for the plaintiff to replead; and in obedience to this order the plaintiff did, on December 21, 1898, file his bill in the circuit court at Waco, numbered on the docket of that court No. 154, in which, besides allegations not necessary to recite, he made the following averments: "And it was expressly stipulated, understood, and agreed that said insurance should be written to become effective with the beginning of the month of May, 1898,—that is, that said insurance should become effective immediately on the termination of the last day of April, 1898; * * * but that, instead of writing said policy of insurance to begin with the 1st day of May, 1898, in accordance with said understanding and agreement, the said agents by mistake issued said policy of insurance to begin at 12 o'clock noon on said 1st day of May, 1898. * * * It is further shown that immediately after said fire respondent repudiated said policy of insurance, and refused to pay your orator the said sum of $15,000 stipulated therein, but respondent is now claiming that said loss occurred before said policy went into effect by its terms; and your orator shows to the court that respondent, having issued said policy in violation of said parol agreement, is seeking to take advantage of its own wrong in setting up and pretending that said policy was not in full force and effect. Your orator shows to the court that said policy did not come into his hands until after said fire and after said loss had occurred, and he did not know until after said fire that said policy had not been issued in accordance with the parol contract and agreement hereinbefore set out,"—concluding with the prayer that the court reform said contract so as to speak the true intent and meaning of the parties thereto with reference to the time said policy should begin; "and he further prays that upon hearing hereof he have a decree against respondent for the sum of $15,000, and all interest due thereon; and he further prays for all such general, special, and equitable relief," etc.

On March 29, 1899 (Cameron having died on February 6th), the appellees brought against the appellant an action at law on this policy in the circuit court at Waco, and on April 11th took judgment by default thereon, which was set aside on April 18th on motion of the appellant, who on that day filed its bill, No. 534, against the appellees to enjoin the action at law just mentioned, and to procure, on the allegations therein made, a decree compelling the appellees to surrender the policy, and to declare the appellant discharged from any liability thereunder. On this bill the circuit court granted a temporary injunction, and decreed that "no action shall be taken in said cause No. 724 until the final judgment and determination of said equity cause No. 154."

It seems that by proceedings not questioned all these suits, except the action numbered 724, were consolidated, the parties were required to replead, and repleadings were filed, on which repleadings the final hearing was had, and resulted in the passing of the following decree:

"No. 534. German Insurance Company v. William Cameron, Consolidated with 154, William Cameron v. German Insurance Company.

"In Equity, May 1st, 1901.

"This cause having been submitted at the last term of this court, and having been taken under advisement, and the court having considered the same, orders, adjudges and decrees as follows: First. The court being of opinion that the evidence in behalf of complainants is insufficient to warrant a reformation of the contract, the petition of complainants for a reformation of the contract is refused and denied. Second. The court also being of opinion that the evidence is insufficient to warrant a rescission of the contract as prayed by respondent, the prayer of respondent for a rescission of the contract of insurance herein is also refused and denied. Third. It appearing to the court that there is a suit at law pending in United States circuit court at Dallas wherein complainants herein are plaintiffs and respondent herein is defendant, and that respondent has heretofore procured an injunction herein restraining the further prosecution of said suit until the termination of this suit, which suit at law is upon the policy of insurance in controversy herein, and the court herein having determined the

matters in controversy in said suit at law, it is ordered and adjudged that said injunction be made perpetual. Fourth. And the court being of opinion from the testimony that the policy of insurance sued on herein went into effect at 12 o'clock noon, May 1, 1898, and that the property covered by said policy of insurance was destroyed by fire after said policy went into effect, it is therefore considered, ordered, adjudged, and decreed by the court that complainants, Flora B. Cameron, Wm. W. Cameron, R. H. Downman, and F. A. McDonald, executors of the estate of Wm. Cameron, deceased, do have and recover of and from respondent, the German Insurance Company of Freeport, Ill., the sum of sixteen thousand six hundred and eighty-eight dollars ($16,688), principal and interest, with interest thereon from this date at the rate of 6 per cent. per annum, and all costs, for which let execution issue."

Numerous errors are assigned by the appellant, a number of which, in various forms, submit that the circuit court sitting in equity did not have jurisdiction to give judgment against the appellant on the policy of insurance. The other assignments, in various forms, submit that the court erred in holding that the appellant had completed any contract of insurance with the appellees' testator which had attached to the property consumed, or which was binding on the company at the time the property was destroyed by the fire.

Geo. Carden and E. G. Senter, for appellant.

H. N. Atkinson for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The appellant applied to the circuit court for equitable relief against the enforcement of one of its outstanding policies of insurance in the hands of William Cameron. Cameron applied to the state court for the reformation and enforcement of the policy. His suit was removed into the circuit court, where he repleaded by bill seeking equitable relief. These suits were duly answered by the respective respondents. Cameron having died, the appellees brought, in the same circuit court, their action at law on the policy. Thereupon the appellant exhibited its second bill in equity for the purpose of enjoining the action at law and of having the whole controversy between the parties settled in the equity proceedings. The court ordered a consolidation of these equity suits and that the parties replead. The parties did replead in the consolidated cause, in which the appellees appear as complainants and the appellant as respondent, and in which the whole controversy was embraced and sought to be settled. The proof taken covered every feature of the controversy. The final hearing was full and exhaustive of all the issues, and the final decree passed disposed of the whole case. The right of a court of equity in such a case as this to proceed to a final determination of all the matters in issue is now fully established. Therefore the assignments of error which raise the question of the jurisdiction of the court in equity to make full and final disposition of the whole cause are not well taken.

Had the parties contracted before the fire occurred? The manager, Reddy, testifies:

"On April 12, 1898, in our office at Bowie, I placed an order with Mr. Craig for insurance amounting to $70,000, of which amount $15,000 was to cover on the dry shed and contents. Mr. Craig said he would like for us

to grant him a few days so he could consult with some of his companies and be able to place the full line to our best mutual advantage. At that time we had no insurance at Bowie. I agreed to the delay, and it was then understood and agreed that the insurance should be written to become effective, beginning May 1st."

He testified further:

"I requested the agents not to place more than five thousand dollars in any one company, but they assured me that if I would leave the matter to them they would fully. protect our interest."

The witness Craig says:

"I had a conversation with T. Gordon Reddy, Jr., Cameron's manager, on April 12, 1898, about insurance, and agreed on that day to place $70,000 of insurance on property of Wm. Cameron. We agreed as to the premium rate, but there was nothing said, either by Reddy or myself, as to what company or companies would be the insurers, except that there was an understanding that if the companies were not satisfactory he would not accept the insurance. Nothing was said about the German Insurance Company of Freeport, Ill., or any other particular company. I represented fifteen or sixteen companies, and Reddy knew this, but I did not at that time represent the German ,Insurance Company of Freeport, Ill. Reddy's instructions to me were to write the insurance on May 1, 1898. The property to be insured was designated. The term the insurance was to run was not agreed on. I told him what the annual rate was, and it seemed to be satisfactory to him. The time for which he wanted the insurance was not discussed, though I supposed he wanted it for a year from 12 o'clock noon, May 1, 1898, as that was the date he designated, and as it is the universal custom of fire insurance companies to have all policies begin at 12 o'clock noon. There was no understanding between Reddy and myself as to how much insurance should be placed in any one company, nor on what particular property any certain company was to be placed."

In another deposition, on cross-examination, Craig testified, in substance:

"It is a fact that in my agreement with Reddy about insurance, before the policy was issued, the amount of insurance on various properties was agreed on, the rate of premium was agreed on, the time was agreed on, and it was further agreed that I [Craig] was to select the companies in which the insurance was to be written, except that the policies and companies, when the policies were written, were to be written subject to the approval of Mr. Reddy."

On April 12, 1898, neither Craig nor his firm had authority to represent the appellant, but he was expecting soon to obtain that authority, and did obtain it on the 26th of that month, on which day he sent a wire message to Reddy (the exact contents of which the record does not disclose), which Reddy answered the next day by letter, as follows:

"New Orleans, La., April 27th, 1898.

"Messrs. Craig, Cage & Suberbielle, New Iberia, La.—Gentlemen: Your wire message of the 26th instant, addressed to me at Bowie, has been forwarded here for my reply. As you know, this war matter come up since we discussed the matter of insurance. It seems to be the common impression that this war business is going to make money matters very tight. In the event of any mishaps to our navy, I am afraid there will be a money panic. The premium covering the insurance which we contemplated placing on the Bowie plant will amount, as you know, to considerable money, and it seems to me if you could make some arrangements by which the insurance could be effected, say May 1st, and premium paid Aug. 1st, without interest, it would make us feel easy in the matter. Please

let me have your views on this matter, for Mr. Cameron has written from Texas on the lines mentioned above.

"Yours truly,                    T. Gordon Reddy, Jr., Manager.

"I will return to Bowie to-night.  Address me there."

Mr. Craig, having previously arranged with the Hibernia National Bank of New Orleans to discount Cameron's note so that the proceeds could be turned into his several companies, consented that the premium for the insurance to be written by Craig, Cage & Suberbielle should be paid by a promissory note given by William Cameron, in their favor, to be dated May 1st, and payable August 1st, amounting to $2,327.50, in which amount was included $600, covering premium on the policy of the German Insurance Company, which policy covered the dry shed.  The appellees now insist that the agreement had between Reddy and Craig, as shown by the evidence just recited, embraced all the elements of a completed insurance contract, to which a written policy would add nothing save better evidence of the terms on which the minds of the contracting parties had met.  This insistence does not take account of the fact that on April 12th Craig had no authority to represent the appellant, nor of the pregnant language of the letter of April 27th addressed by Reddy to Craig's firm, nor of Craig's testimony that the policies and companies when the policies were written were to be written subject to the approval of Mr. Reddy, nor of the testimony of Mr. Reddy that he had requested the agents not to place more than $5,000 in any one company.  At some time before 10 a. m., May 1, 1898, the policies, eighteen in number (including the one in controversy here), were written up, duly authenticated by Craig, who was authorized to issue the same, done up in a package, addressed to Wm. Cameron, Bowie, La., and placed with the agent of the express company at New Iberia for shipment.  Besides the 18 policies the package contained the following letter:

"Craig, Cage & Suberbielle, General Insurance.

"New Iberia, La., April 30th, 1898.

"Mr. William Cameron, Bowie, La.—Dear Sir:  Herewith we beg to hand you policies covering your saw and planing mills, lumber shed and contents, commissary and boarding house, amounting to $70,000, which we trust will meet with your approval.  The civil engineer will be down either Tuesday or Wednesday.  Thanking you for your kind favor, we are,

"Yours respectfully,                    Craig, Cage & Suberbielle,
                                               "Per Craig."

About 1 o'clock on that day Craig learned that a fire was burning in the Cameron properties at Bowie, and he immediately went to the express office, and reclaimed the package of policies and letter of advice which he had delivered for shipment, as above stated.  During these midday hours manager Reddy was strenuously engaged on the fire-line at Bowie.  When the fire alarm whistle blew a few minutes after 11 o'clock he answered the call promptly, and had the trained corps of men who were on duty under him, with not less than 200 other men, at work in 15 minutes after the fire broke out.  His facilities for fighting it consisted of a Fred M. Prescott force pump, size 14x7x12, 7" suction, 5" discharge, upon which was carried from 80 pounds to 120 pounds pressure upon water mains.  There were

three main pipes, all leading to or in close proximity to the fire; also three double hydrants convenient to the fire, upon which were coupled two lines of hose from each one, and from other hydrants more remote were fetched three more lines of hose, and at one time there were nine streams of water bearing on or around the fire. To help the pressure, later four of these were taken off, but five streams played continually upon the points most available, under the direction of the manager of the plant. The hose was 2½" hose, previously tested at 100 pounds pressure, opening of nozzles 1¼". All connections in and around plant used for fire purposes were and are 2½". W. E. Fall, an employé in the wholesale department of William Cameron & Co., at Waco, Tex., was in Bowie on that day. He, too, did his utmost until he became overheated, and at 12.30 p. m. had to get into the planer shed to cool off. Every man and boy in Bowie who was able to do any work was pressed into service, besides a good many laborers who were sent over to assist by neighboring planters. The town of Thibodeaux, on request, promptly sent by special train all the hose in that town that could be spared. All connections were cut away between the dry shed and planer and between the mill and kilns. Besides, several hundred feet of dolley ways were torn up and carried off a safe distance or used as shields or fenders for the nozzle men to stand behind. Mr. Reddy, the manager of the plant, organized a fire crew, and, after the fire had communicated with the yard, decided that it would be better to draw the forces back to a certain intersection of dolley ways, and make a stand at that particular point. The fire was arrested just as he intended. About 6 o'clock Mr. Reddy was able to telegraph Mr. Cameron:

"Fire originated in dry kilns at noon to-day. Kilns, lumber shed, and about seventy-five piles of lumber on yard destroyed. Fire still burning, but apparently under control."

In his deposition filed September 12, 1898, Mr. Reddy testifies in reference to the policies mentioned above:

"These policies were delivered to me by Mr. Craig in the presence of W. E. Fall. The circumstances attending the delivery of these policies are these: On the evening of May 1, 1898, after the fire which originated in our dry kilns, a risk which was uninsured, and worth to us about $16,000, had spread to the large lumber shed and to piles of lumber on the yard, I asked my bookkeeper if the policies from Craig, Cage & Suberbielle had reached our office. I had a telegram sent to them at New Iberia asking them if the policies covering insurance as per our order had been forwarded, and, if not, would they send them to us by the next train, which was due to pass Bowie on Monday morning. Receiving no reply to this message, I grew apprehensive, and went that night at 10 o'clock to Raceland Station, one mile distant from Bowie, where there was a night telegraph office, and from which place I made inquiry by wire of the agent at New Iberia in telegraph office whether any package addressed either to Mr. Cameron or myself was there to be forwarded to us on the morning train. Being informed there was no such package there, I boarded the train at Raceland about 10:20 p. m., and, in company with Mr. W. E. Fall, who is connected with the office of William Cameron & Co., at Waco, Texas, and who was on that day on a visit to me at Bowie, and we together went to New Iberia for the purpose of finding out why these policies had not been sent by Craig, Cage & Suberbielle, and why I did not receive any answer to my telegram of that evening. Mr. Fall and myself set out to find some member of that insurance firm, when about one o'clock Monday morning

we located Mr. Craig in a saloon. Mr. Craig informed us that he was sitting up to catch the early morning train for Bowie to bring our policies to us. He stated that the policies had been made out on Saturday, April 30, 1898, but by an oversight they had not gone forward until Sunday, when he discovered them in the office. He then took the package to the express office at New Iberia, and placed it there to be forwarded to us. While at the depot he learned that there was a fire then burning * * * at our place at Bowie, * * * and he concluded to withdraw the package from the express office, which he did. He then informed us that he had the package in his pocket at that time, and he produced it. The package was all intact, done up, sealed, and addressed to William Cameron, Bowie, La. I explained to Craig that my business there was to get the policies, because we had had a fire that day, and desired to get the policies, and had grown apprehensive for the reasons above stated. I broke open the package, and found it to contain about eighteen policies, aggregating $70,000, together with a bill for the premiums on said policies, together with a letter addressed to William Cameron, date April 30th, 1898. The premiums for this insurance, as per special agreement had and entered into between myself and Mr. Craig, was to be paid by promissory note to be signed by Mr. William Cameron, dated May 1, 1898, and payable August 1, 1898, without interest. Mr. Craig had previously arranged with the Hibernia National Bank of New Orleans to discount this note, so the proceeds could be turned into his several companies. I explained to Mr. Craig that in view of this fire I did not want any hitch, if there could be any hitch, to arise on the question of premium, and I told him I would waive my previous agreement, and tendered him payment. This Mr. Craig said made no difference, and this ended the matter."

In his deposition filed November 18, 1899, Mr. Reddy says:

"When Fall and myself left Bowie for New Iberia, I wrote out an order on Craig, Cage & Suberbielle, directing that they deliver to Fall our policies. I did so because we intended to go in different directions when we got to New Iberia, looking up one of the firm of Craig, Cage & Suberbielle, and Fall had an order so he could explain himself when he met either of them. I did not intend remaining in New Iberia except between trains, as I had to return to Bowie, and, if we failed that morning to find Craig or his partners, Fall was to remain and get our policies, but it so happened that we found Craig shortly after our arrival at New Iberia. Craig had the policies, and offered no protest at all. He stated he was waiting up then to catch the train for Bowie, and that he intended to bring the policies in person to us."

Craig in his deposition filed December 15, 1899, being asked to attach to the interrogatories and mark "Exhibit B" a communication addressed to "Craig, Cage & Suberbielle, Agents," dated May 1, 1898, signed "T. Gordon Reddy, Jr., Manager," and being further asked: "Was said paper delivered to you? If so, by whom, and whose signature is to the same? Explain said paper fully. If it relates to insurance, then state in what companies and in what amounts, and by whom issued,"—answered:

"Yes; delivered to W. E. Fall, and signed by T. Gordon Reddy, Jr., and the original is hereto attached. It relates to the insurance ordered by T. Gordon Reddy, Jr., of me in various companies, of which the policy sued on is one. * * * Said paper was presented to me by W. E. Fall. I inquired of Fall what he wished to do with the policies. He replied that he was on his way to the Waco office, and desired to take the insurance policies issued by me, together with those issued through the Pescud agency, to the Waco office. I inquired of him whether he had had a fire at Bowie or not, and whether he had any claim under my policies or not. He replied that they had had a small blaze, but there was no claim under my policies. After some questions, I concluded to deliver him the package of policies.

It was in the saloon owned by C. P. Moss, in New Iberia, La., about the hour of 1:30 a. m., on May 2, 1898. * * * I saw T. Gordon Reddy, Jr., immediately after the delivery of the package to Fall. It was in the saloon of C. P. Moss. Clarence Colgin was present. Reddy said, 'Well, Craig, you just owe us about $14,000;' and I replied, 'Well, the jig is up; it is a pretty slick trick on your part.' "

The appellees took the deposition of W. E. Fall, but did not question him as to this transaction, and the appellant did not cross the interrogatories. The appellant took the deposition of Clarence Colgin, the only person present at the interview between Fall, Reddy, and Craig, who, in answer to pertinent interrogatories, said:

"The conversation between Fall and Craig was in the Moss restaurant, adjoining the Moss saloon, separated by a wall with opening in same building. Their conversation was after midnight. The conversation between Craig and Fall was in reference to insurance papers. Fall wanted Craig to deliver him some insurance policies. * * * It related to insurance on a dry kiln shed. * * * At the time of the conversation between Fall and Craig, as stated, I saw Reddy on the outside of the Moss saloon building."

In answer to a part of the interrogatory requesting the witness to "state whether or not Reddy said anything about the delivery of certain insurance policies by Craig to Fall, and what he said," Colgin testifies, "Reddy told Julian J. Craig that he wanted the policies, and must have them." In answer to cross interrogatory 4, by the appellees, "State whether the said Craig appeared to be frightened or terrified by the words or manner of Reddy and Fall," he answered: "Yes; Craig did appear to me to be frightened, which is one reason why my attention was attracted so closely. It appeared they insisted strongly on having the policies from Craig."

The order to which the witnesses Reddy and Craig refer is in the following words:

"Bowie, La., May 1st, 1898.

"Craig, Cage & Suberbielle, Agents, New Iberia, La.—Dear Sirs: If you have not already mailed or expressed us the insurance policies covering on our risk here at Bowie, will you then please hand same to the bearer, Mr. W. E. Fall, of our Waco office. Mr. Fall will give you necessary receipt for same. Yours truly,                                    T. Gordon Reddy, Jr.,

"Manager."

It was in the possession of Craig at the time he testified, and he attached the original to his deposition. It appears from Reddy's testimony that it was written at the time he and Fall left Bowie on the night of May 1st. He says that he left Bowie and went to Raceland at 10 o'clock p. m. At that time the long shed and its contents had been utterly consumed, and was a vast mass of superheated ashes and burning coals. Reddy's mind was then supremely intent on getting possession of the insurance policies. He was just about to start to New Iberia, 83 miles away, to hunt up some one of the members of the firm of insurance agents in the middle of the night to obtain the policies. To aid him in this extraordinary effort, he was taking with him a member of the Waco home office then present in Bowie, and gave the above written order to that companion of his quest to enable him to explain matters to whichever member of the firm he might find. It contains not the slightest reference to the fire that

had so intensely engaged Reddy's attention for so many hours on
that day. We refrain from making those further suggestions which
this testimony must excite in the minds of all intelligent readers, cer-
tainly of all readers who are lawyers. It seems to us to be too clear
for controversy that the position of Mr. Cameron was not bettered
by this acquisition of the manual possession of the policies, and that
the method of acquisition pursued and effected by Mr. Cameron's
manager, with whom the negotiations for the insurance had been con-
ducted, casts a white light along the whole track of those negotia-
tions. But we proceed. In one of his depositions Craig was asked:

"State whether or not you had any conversation with William Cameron
after the fire with respect to his surrender of the policy of insurance at-
tached to complainant's bill. State whether or not you demanded of said
Cameron said policy of insurance. State whether he acceded to or refused
this demand, if any, and state what he said, if anything, with respect
thereto."

Answer:

"Mr. Cameron and Mr. Shumard, in my presence, had such a conversation
on or about May 5, 1898, and during the progress of this conversation Mr.
Cameron, turning to me, criticised me for placing so much insurance in one
company, and said he would not take the policies I had written up for him,
and returned them to me, with the exception of the policy herein sued upon,
which he claimed the German Insurance Company was liable under. Mr.
Shumard demanded this policy, and Mr. Cameron refused to turn it over to
him."

It appears from the bill rendered to Cameron, which was inclosed
in the package with the policies, and Craig's letter of April 30, 1898,
that of the 18 policies written up by Craig the one in suit was for the
largest amount, and that of all the other 17, amounting in the aggre-
gate to $55,000, only one exceeded in amount the sum of $5,000.
That one was for $10,000, in the appellant company, on the sawmill.

It is to be observed that in Reddy's letter of April 27, 1898, the
previous communications between him and Craig were referred to as
the matter of insurance "we discussed," and, again, as "the insurance
which we contemplated placing on the Bowie plant." It made men-
tion also of the changed and changing condition of general affairs,
and expressed the apprehension that, "in the event of any mishaps to
our navy, * * * there will be a money panic." He suggested
that the premiums covering the insurance "will amount to a consid-
erable sum of money," and that if Craig could make some arrange-
ments by which the insurance could be effected, say May 1st, and
premium paid August 1st, without interest, "it would make us [Cam-
eron & Co.] feel easy in the matter." On this matter he desired to
have Craig's views, "for Mr. Cameron has written from Texas on
the lines mentioned above." This letter was written at New Orleans,
four days before the fire occurred, and addressed to Craig's firm at
New Iberia, where it could hardly have arrived before some hour on
the next day, or three days before the fire. Craig, having first ar-
ranged with a New Orleans bank to discount Mr. Cameron's note for
the amount of the premiums, consented to the arrangement suggested
in the letter. On the day before the fire Craig was at Bowie, for
in his deposition he says, "I returned from Bowie on April 30, 1898;"

but it does not appear that while at Bowie on that visit he saw either Reddy or Cameron, or any one authorized to act for them. And Reddy deposes: "The last conversation prior to the fire we had with Craig was on April 12, 1898." It does not appear that Reddy had authority to make Mr. Cameron's note in favor of Craig's firm for the amount of the premium. It is not claimed that such a note was ever made by Cameron himself or by Reddy for him. In the letter addressed to Mr. Cameron accompanying the policies Mr. Craig, referring to them, says, "which we trust will meet with your approval." In one of his depositions Craig says: "There was nothing said either by Reddy or myself as to what company or companies would be the insurers, except that there was an understanding that if the companies were not satisfactory he would not accept the insurance." And in his other deposition he says: "The policies, and companies when the policies were written, were to be written subject to the approval of Mr. Reddy."

It is seen that these negotiations were pending for nearly 20 days, during the whole of which time there was no insurance on any of the large properties held by Cameron at Bowie. There is no proof that any part of it had ever been insured. It is manifest that Cameron was not anxiously solicitous to effect insurance on the property there. The nature of the property, and the hazard on account of its situation and respective exposures, were such that, of necessity, the owner was compelled to carry a large, if not the larger, part of the risk, and, to get it covered to any extent, would be compelled to pay a high rate of premium; and the length of the line of insurance necessary to relieve him to any desirable extent was such as required that he should insist on having it distributed among a large number of the safest insurance companies, with lines in each to such a limited extent as to afford the least temptation to the companies to litigate in case of a loss. His property and business and employés practically consti tuted the town of Bowie. His best insurance against fire was the care he was able to exercise in preventing its occurrence, and in arresting it should it occur, for both of which purposes he had made most ample provision. He was a man of large and successful experience,—a masterful man in all matters affecting his own business. It seems to us to be clear from the proof that it was never in the mind of either Craig or Reddy or Cameron that a contract for insurance between Craig's companies and Cameron should become complete until the policies, showing by what companies written and on what terms, had been submitted either to Cameron, or to Reddy and Cameron, and approved and accepted by them. We cannot doubt that if the fire had not occurred on May 1st, and before Cameron had after that date received and examined the policies, he would have disapproved and rejected the one here involved, not because it was written to cover the risk from 12 o'clock noon instead of from the previous midnight (because then that provision would have become immaterial or would be 12 hours in his favor), but because it was for an amount three times as large as he was willing to have written by any one company on the property covered. From a thorough examination of the proof, and due deliberation thereon, we are con-

vinced that the negotiations between the appellant and the testator of the appellees never matured into a contract for insurance.

It follows that the decree of the circuit court must be reversed, and we will here render the decree which that court should have rendered. Exercising the discretion inherent in a court of equity in awarding costs, in view of the numerous suits filed and the unnecessary issues presented, we conclude that it will be most consonant with justice in this case to require that each party shall pay the costs by them respectively incurred in this cause in this court and in the circuit court, including the enjoined action at law in the circuit court. It is therefore adjudged and decreed that the appellees are perpetually enjoined against prosecuting any action at law on the purported policy of insurance in question; that the appellant never became liable to the testator of the appellees under that instrument, is not now liable to the appellees in any amount on account thereof, and is now fully acquitted and discharged from all claim of the appellees thereunder; and that the parties hereto pay the costs by them respectively incurred in this cause in this court and in the circuit court, including the costs in the action at law.